78 FR 60454-01, 2013 WL 5428279(F.R.)
RULES and REGULATIONS
DEPARTMENT OF LABOR
Wage and Hour Division
29 CFR Part 552
RIN 1235-AA05

Application of the Fair Labor Standards Act to Domestic Service

Tuesday, October 1, 2013

AGENCY: Wage and Hour Division, Department of Labor.

 **\*60454**  ACTION: Final rule.

SUMMARY: In 1974, Congress extended the protections of the Fair Labor Standards Act (FLSA or the Act) to "domestic service" employees, but it exempted from the Act's minimum wage and overtime provisions domestic service employees who provide "companionship services" to elderly people or people with illnesses, injuries, or disabilities who require assistance in caring for themselves, and it exempted from the Act's overtime provision domestic service employees who reside in the household in which they provide services. This Final Rule revises the Department's 1975 regulations implementing these amendments to the Act to better reflect Congressional intent given the changes to the home care industry and workforce since that time. Most significantly, the Department is revising the definition of "companionship services" to clarify and narrow the duties that fall within the term; in addition third party employers, such as home care agencies, will not be able to claim either of the exemptions. The major effect of this Final Rule is that more domestic service workers will be protected by the FLSA's minimum wage, overtime, and recordkeeping provisions.
DATES: This regulation is effective January 1, 2015.

FOR FURTHER INFORMATION CONTACT: Mary Ziegler, Director, Division of Regulations, Legislation, and Interpretation, U.S. Department of Labor, Wage and Hour Division, 200 Constitution Avenue NW., Room S-3502, FP Building, Washington, DC 20210; telephone: (202) 693-0406 (this is not a toll-free number). Copies of this Final Rule may be obtained in alternative formats (Large Print, Braille, Audio Tape, or Disc), upon request, by calling (202) 693-0675 (not a toll-free number). TTY/TTD callers may dial toll-free (877) 889-5627 to obtain information or request materials in alternative formats.
Questions of interpretation and/or enforcement of the agency's current regulations may be directed to the nearest Wage and Hour Division (WHD) District Office. Please visit http://www.dol.gov/whd for more information and resources about the laws administered and enforced by WHD. Information and compliance assistance materials specific to this Final Rule can be found at: www.dol.gov/whd/homecare. You may also call the WHD's toll-free help line at (866) 4US-WAGE ((866)-487-9243) between 8:00 a.m. and 5:00 p.m. in your local time zone..

SUPPLEMENTARY INFORMATION:

**Table of Contents**

I. Executive Summary

II. Background

III. Summary of Comments on Changes to FLSA Domestic Service Regulations

exceeding "20 percent of the total weekly hours worked." Section 552.109 provided that third party employers could claim the companionship services exemption or live-in domestic service employee exemption.

On December 30, 1993, the Department published a Notice of Proposed Rulemaking (NPRM) in the Federal Register, inviting public comments on a proposal to revise 29 CFR 552.109 to clarify that, in order for the exemptions under § 13(a)(15) and § 13(b)(21) of the FLSA to apply, employees engaged in companionship services and live-in domestic service who are employed by a third party employer or agency must be "jointly" employed by the individual, family, or household using their services. Other *60458 minor updating and technical corrections were included in the proposal. See 58 FR 69310. On September 8, 1995, the Department published a Final Rule revising the regulations to incorporate changes required by the recently enacted changes to Title II of the Social Security Act and making other updating and technical revisions. See 60 FR 46766. That same day, the Department published a proposed rule re-opening and extending the comment period on the proposed changes to § 552.109 concerning third party employment. See 60 FR 46797. The Department did not finalize this proposed change.

On January 19, 2001, the Department published an NPRM to amend the regulations to revise the definition of "companionship services" to more closely adhere to Congressional intent. The Department also sought to clarify the criteria used to determine whether employees qualify as trained personnel and to amend the regulations concerning third party employment. On April 23, 2001, the Department published a proposed rule re-opening and extending the comment period on the January 2001 proposed rule. See 66 FR 20411. This rulemaking was eventually withdrawn and terminated on April 8, 2002. See 67 FR 16668.

On December 27, 2011, the Department published an NPRM inviting public comments for a period of sixty (60) days on proposed changes to the exemptions for employees performing companionship services and live-in domestic service employees. See 76 FR 81190. The proposed changes were based on the Department's experience, including its previous rulemaking efforts, a thorough review of the legislative history, meetings with stakeholders, as well as additional research conducted concerning the changes in the demand for home care services, the home care industry, and the home care services workforce. On February 24, 2012, the Department extended the period for filing written comments. See 77 FR 11021. On March 13, 2012, the Department again extended the period for filing written comments with a final comment closing date of March 21, 2012. See 77 FR 14688. This Final Rule is the result of consideration of the comments received in response to the December 27, 2011 NPRM.

*C. Need for Rulemaking*
Since the Department published its regulations implementing the 1974 amendments to the FLSA, the home care industry has undergone dramatic transformation. In the 1970s, individuals who had significant care needs went into institutional settings. Over time, however, our nation has come to recognize the importance of providing services in private homes and other community-based settings and of supporting individuals in remaining in their homes and communities. This shift is in part a result of the rising cost of traditional institutional care, and has been made possible in significant part by the availability of government funding assistance for home care under Medicare and Medicaid.[FN2] The growing demand for long-term home care services is also due to the significant increase in the percentage of elderly people in the United States.[FN3] The Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581 (1999), which held that it is a violation of the Americans with Disabilities Act for public entities to fail to provide services to persons with disabilities in the most integrated setting appropriate, further solidified our country's commitment to decreasing institutionalization and has also influenced this important trend.

This shift is reflected in the increasing number of agencies and workers engaged in home care. The number of Medicare-certified home care agencies increased from 2,242 in 1975 to 7,747 in 1999 and by the end of 2009, had grown to 10,581. [FN4] There has been a similar increase in the employment of home health aides and personal care aides in the private homes of individuals in need of assistance with basic daily living or health maintenance activities. The number of workers in these jobs tripled between 1988 and 2001; by 2001 there were 560,190 workers employed as home health aides and

services such that direct care workers providing medical care, including certified nursing assistants and often home health aides, are not protected by the FLSA. See, e.g., McCune, 894 F.2d at 1110-11(holding that certified nursing assistants were not "trained personnel" excluded from the regulatory definition of companionship services because, unlike registered nurses and licensed practical nurses, certified nursing assistants in that case received only 60 hours of training); Cox v. Acme Health Servs., Inc., 55 F.3d 1304, 1309-10 (7th Cir. 1995) (holding that a home health aide who had completed 75 hours of required training and "performed patient care" including "administering complete bed baths, position and turning patients in bed, tube-feeding, the taking and recording of vital signs, bowel and bladder training, changing and cleaning patients' catheters, administering enemas, range-of-motion exercise training, speech training, and inserting non-medicated suppositories" did not qualify as "trained personnel" and therefore provided "companionship services" as defined in the Department's regulations).

In this Final Rule, the Department is exercising its authority to amend the domestic service employment regulations to clarify and narrow the set of employees as to whom the companionship services and live-in domestic service employee exemptions may be claimed. See Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 165 (2007) (discussing the gaps in the FLSA, including "the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services'" that Congress "entrusted the agency to work out" (citing 29 U.S.C. 213(a)(15))). These limits are meant to ensure that these exemptions are applied only to the extent Congress intended in enacting the 1974 amendments.

Furthermore, because of the Department's revisions to these regulations, as home-based services continue to expand, employers will have clear guidance about the need to afford most direct care workers the protections of the FLSA, and the continued growth of home-based services will occur based on a realistic understanding of the professional nature of the home care workforce. Specifically, as explained in detail in this preamble, only direct care workers who primarily provide fellowship and protection are providing companionship services. Direct care workers who are employed by third party employers, such as private home care agencies, are the type of professional workers whose vocation merits minimum wage and overtime protections. Direct care workers who provide medically related services, such as certified nursing assistants, are doing work that calls for more skill and effort than that encompassed by the term "companionship services." The Department believes that based on these principles, most direct care workers acting as home health aides, and many whose title is personal care assistant, will be entitled to minimum wage and overtime. These workers are due the respect and dignity that accompanies the protections of the FLSA.

The Department recognizes that this Final Rule will have an impact on individuals and families who rely on direct care workers for crucial assistance with day-to-day living and community participation. Throughout the rulemaking process, the Department has carefully considered the effects of the rule on consumers and has taken into account the perspective of elderly people and people with illnesses, injuries, and disabilities, as well as workers, employers, public agencies, and others. The Department has responded to comments from members of those groups and organizations representing them throughout this Final Rule. In particular, this preamble explains that the Department does not believe, as some commenters have suggested, that the rule will interfere with the growth of home- and community-based caregiving programs and thereby lead to increased institutionalization. Furthermore, the preamble explains that many states require the payment of minimum wage and often overtime to direct care workers, and the detrimental effects on the home care industry some commenters predict have not occurred in those states. To the contrary, the Department believes that ensuring minimum wage and overtime compensation will not only benefit direct care workers but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower **\*60460** turnover, and a higher quality of care. Furthermore, as described in detail throughout this preamble, the Department has modified the proposed regulations in response to comments to make the rule easier for the regulated community to understand and apply.

**III. Summary of Comments on Changes to the FLSA Domestic Service Regulations**

More than 26,000 individuals commented on the Department's Notice of Proposed Rulemaking. Comments were received from a broad array of constituencies, including direct care workers, consumers of home care services, small business owners and employers, worker advocacy groups and unions, employer and industry advocacy groups, law firms, Members of Congress, state government agencies, federal government agencies, professional associations, the disability community, and other interested members of the public. Several organizations attached the views of some of their individual members: National Partnership for Women and Families (8,733 individual comments), Progressive Jewish Alliance and Jewish Funds for Justice (687 individual comments), and Interfaith Worker Justice (500 individual comments), for example. Other organizations submitted a comment and attached membership signatures, such as the National Women's Law Center (Center) (3,392 signatures). Additional comments submitted after the comment period closed are not considered part of the official record and were not considered. All comments timely received may be viewed on the www.regulations.gov Web site, docket ID WHD-2011-0003.

Many comments received in response to the NPRM are: (1) Very general statements of support or opposition; (2) personal anecdotes that do not address a specific aspect of the proposed changes; (3) comments that are beyond the scope or authority of the proposed regulations; or (4) identical or nearly identical "form letters" sent in response to comment initiatives sponsored by various constituent groups. The remaining comments reflect a wide variety of views on the merits of particular sections of the proposed regulations. Many include substantive analyses and arguments in support of or in opposition to the proposed regulations. The substantive comments received on the proposed regulations are discussed below, together with the Department's response to those comments and a section-by-section discussion of the changes that have been made in the final regulatory text.

*Terminology*
Several commenters indicated that terms used by the Department in the NPRM were inconsistent with industry use and may be misinterpreted. Commenters themselves used a number of different terms in referring to the industry, the workers potentially impacted by the proposed rule, and the individuals receiving services from workers potentially impacted by the proposed rule. The Department has made an effort to modify its use of language where possible in the Final Rule except when quoting the statute, legislative history, case law, or when quoting a commenter. For example, the Department notes that the terms "aged" and "infirmity" appear in the current regulatory text due to the language Congress used in the statutory exemption. See 29 U.S.C. 213(a)(15). However, where possible throughout the preamble discussion, the Department instead uses the term "consumers" or "elderly people or people with illnesses, injuries, or disabilities" when discussing those who receive home care services, including companionship services. When discussing the workers who may be impacted by the Final Rule, the Department instead uses the term "direct care worker" to encompass the occupational categories of these domestic service workers and the terms used by commenters, such as home health aides, personal care aides, attendants, direct support professionals, and family caregivers. Finally, in this Final Rule, the Department uses the term "home care" to reflect the broader industry rather than home health care which specifically covers medical assistance performed by certified personnel.

*Section-by-Section Analysis of Final Regulations*

**A. Section 552.3 (Domestic Service Employment)**
Section 552.3, which defines domestic service employment, currently reads, "[a]s used in section 13(a)(15) of the Act, the term domestic service employment refers to services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed." Section 552.3 also provides an illustrative list of various occupations which are considered "domestic service employment."

In the NPRM, the Department proposed to update and clarify the definition of domestic service employment in § 552.3. Specifically, the Department proposed to remove the qualifying introductory language "as used in section 13(a)(15) of the Act" because section 13(a)(15) refers to the Act's exemption for those employed to provide babysitting services

Some commenters expressed concern that the services paid family care providers typically perform, such as household work, meal preparation, assistance with bathing and dressing, etc., would not fall within the definition of companionship services under the proposed rule. See, e.g., National Association of States United for Aging and Disabilities, ANCOR, NASDDDS. If paid family care providers are not performing exempt companionship services under the FLSA, these commenters wrote, the services they provide would become more expensive, and consequently, the options for employing family members through Medicaid-funded programs or for more than 40 hours per week would be severely limited. Id. Additionally, Foothills Gateway, Inc., a non-profit agency that provides Medicaid-funded services to individuals with developmental disabilities in Colorado, expressed concern that if paid family care providers are entitled to minimum wage and overtime for all hours during which they provide services to the consumer, including those that were previously unpaid, the costs of care would far exceed those Medicaid will reimburse, making the paid family caregiving model unsustainable.

The Department is aware of and sensitive to the importance and value of family caregiving to those in need of assistance in caring for themselves to avoid institutional care. It recognizes that paid family caregiving, in particular through certain Medicaid-funded and certain other publicly funded programs, is increasing across the country, and that such programs play a critical role in allowing individuals to remain in their homes. The Department also recognizes that some paid or unpaid caregivers who are not family but are household members, meaning they live with the person in need of care based on a close, personal relationship that existed before the caregiving began—for example, a domestic partner to whom the person is not married—are the equivalent of family caregivers.

The Department cannot adopt the suggestion of several commenters that the services paid family care providers typically perform be categorically considered exempt companionship services. Although as commenters stated, family care providers may often spend a significant amount of time providing assistance with ADLs and IADLs, the Department is defining companionship services to include only a limited amount of such assistance for the reasons described in the section of this Final Rule explaining the revisions to § 552.6. Furthermore, there is no basis in the FLSA for treating domestic service employees who are family members of their employers differently than other workers in that category. Congress explicitly exempts family members when it is its intention to do so. See 29 U.S.C. 203(e)(3); 203(s)(2); 213(c)(1)(A), (B). The provisions of the statute regarding domestic service and companionship services do not indicate intention to exempt family members. See 29 U.S.C. 206(f), 207(l), 213(a)(15).

*Interpretation of "Employ" With Regard to Family or Household Care Providers*
The Department recognizes the significance and unique nature of paid family and household caregiving in certain Medicaid-funded and certain other publicly funded programs as described above. In interpreting the economic realities test to determine when someone is employed (i.e., suffered or permitted to work, 29 U.S.C. 203(g)), the Department has determined that the FLSA does not necessarily require that once a family or household member is paid to provide some home care services, all care provided by that **\*60488** family or household member is part of the employment relationship. In such programs, as described above, the Department will not consider a family or household member with a pre-existing close, personal relationship with the consumer, to be employed beyond a written agreement developed with the involvement and approval of the program and the consumer (or the consumer's representative), usually called a plan of care, that reasonably defines and limits the hours for which paid home care services will be provided. The determination of whether such an agreement is reasonable includes consideration of whether it would have included the same number of paid hours if the care provider had not been a family or household member of the consumer.

The Department believes this interpretation follows from the application of the FLSA "economic realities" test to the unique circumstances of home care provided by a family or household member. Ordinarily, a family or household member who provides unpaid home care to another family or household member would not be in an employment relationship with the recipient of the support. But under the FLSA, family members can be hired to be domestic service employees of other family members, in which case, unless a statutory exemption applies, they are entitled to minimum

wage and overtime for hours worked. See 29 U.S.C. 206(f), 207(l) (requiring the payment of minimum wage and overtime compensation to "any employee engaged in domestic service" without creating any exception for family members); Velez v. Sanchez, 693 F.3d 308, 327-28 (2d Cir. 2012) (explaining that a familial relationship does not preclude the possibility that the economic realities of the situation show that an individual is a domestic service employee). The decision to select a family or household member as a paid direct care worker through a Medicaid-funded or certain other publicly funded program creates an employment relationship under the FLSA, and the services paid family or household care providers perform in those circumstances likely will not, because of the nature of the paid duties and possibly also the involvement of a third party employer, be exempt companionship services. Ordinarily, under the FLSA, including in the domestic service employment context, if an employment relationship exists, all hours worked by an employee for an employer, as defined at 29 CFR part 785 and § 552.102 and discussed elsewhere in this Final Rule, are compensable. But in the case of certain Medicaid-funded and certain other publicly funded programs, different considerations apply where a prior familial or household relationship exists which is separate and apart from the creation of any employment relationship and where the relevant paid services are the provision of home care services. Specifically, in the context of direct care services under a Medicaid-funded or certain other publicly funded home care program, the FLSA "economic realities" test does not require that the decision to select a family or household member as a paid direct care worker means that all care provided by that person is compensable. In other words, in these circumstances, the Department does not interpret the law as transforming, and does not intend anything in this Final Rule to transform, all care by a family or household member into compensable work.

For example, a familial relationship, but not an employment relationship, would exist where a father assists his adult, physically disabled son with activities of daily living in the evenings. If the son enrolled in a Medicaid-funded or certain other publicly funded program and the father decides to become his son's paid care provider under a program-approved plan of care that funds eight hours per day of services that consist of assistance with ADLs and IADLs, the father would then be in an employment relationship with his son (and perhaps the state-funded entity) for purposes of the FLSA. As explained in the sections of this Final Rule addressing § 552.6 and § 552.109, based on the nature of the paid services and possibly also the involvement of a third-party employer, the father's paid work would not fall under the companionship services exemption. If the relevant requirements (described below) are met, including that the hours of paid work described in a plan of care or similar document are reasonable as described above, the father's employment relationship with his son (and, if a joint employment relationship exists, the state or certain other publicly funded employer administering the program) extends only to the eight hours per day of paid work contemplated in the plan of care; the assistance he provides at other times is not part of that employment relationship (or those employment relationships) and therefore need not be paid.

The limits on the employment relationship between a consumer and a family or household care provider and a third-party entity and that care provider arise from the application of the "economic realities" test, described in more detail in the section of this Final Rule discussing joint employment. Specifically, where a prior familial or prior household relationship exists separate and apart from any paid arrangement for home care services, the economic realities test applies differently to the two roles played by the family or household member. The Second Circuit has identified a number of useful factors for applying the economic realities test in the family domestic service employment context, calling for consideration of: "(1) The employer's ability to hire and fire the employee; (2) the method of recruiting or soliciting the employee; (3) the employer's ability to control the terms of employment, such as hours and duration; (4) the presence of employment records; (5) the expectations or promises of compensation; (6) the flow of benefits from the relationship; and (7) the history and nature of the parties' relationship aside from the domestic labor." Velez, 693 F.3d at 330. Based on an analysis of these factors in the special situation of paid family or household care providers, an employment relationship would exist only as defined and limited by a written agreement developed with the involvement and approval of a Medicaid-funded or similar publicly funded program, usually called a plan of care, that reasonably sets forth the number of hours for which paid home care services will be provided.

Under an analysis of the economic realities of the work compensated under a plan of care or similar written agreement, the consumer or the entity administering the Medicaid-funded or similar publicly funded home care program (or perhaps both) are employers of the family or household care provider. (Again, whether the entity administering a program is a third party employer of the care provider is determined as described in the section of this preamble discussing joint employment.) The consumer, and/or the entity, recruit and hire the family or household member to provide the services described in the plan of care, may fire the family or household member from the paid position, and control the number of hours of work and the type of work the family or household member must perform. There is a clear expectation and promise of compensation, and employment records must be kept in order to receive payment. During the hours for which a family or household care provider is **\*60489** compensated under a plan of care, the care provider is obligated to perform the services he or she was hired to provide. In addition, a paid family or household care provider is not permitted to substitute someone else to receive payment from Medicaid for services provided pursuant to the plan of care without employer approval.

On the other hand, during the time when the family or household care provider may perform similar services beyond the hours that he or she has been hired to work under the plan of care, an analysis of the economic realities of the situation leads to the conclusion that the caregiver is not employed, and that the consumer and any entity administering the Medicaid-funded or similar publicly funded program are not employers. The family or household member has not been hired to perform this additional care, nor was he or she recruited for a paid position performing them. The family or household member has no expectation of compensation, nor has any been promised, and there will not be employment records regarding any unpaid services. During this time, the family or household member's activities are not restricted by an agreement to provide certain services, and the family or household member can choose to come and go from the home and have other family members or other people provide the supports. Importantly, the unpaid support stems from a prior familial or household relationship that is separate and apart from the initiation of any employment relationship.

The discussion above addresses only the unique circumstances that exist in the context of domestic service employment by paid family and household member caregivers. The Department believes this bifurcated analysis is warranted because of the special relationships between family and household members and the special environment of the home. It does not apply outside the home care service context; the Department views work for a family business, for example, as subject to the typical FLSA law and regulations regarding the employment relationship and hours worked. This analysis also does not generally apply to relationships that do not involve preexisting family ties or a preexisting shared household. Therefore, except as noted below, it would not apply to a direct care worker who did not have a family or a household relationship with the individual in need of services prior to the individual's need arising or the creation of the plan of care. In other words, a direct care worker who becomes so close to the consumer as to be "like family," or a direct care worker who becomes part of the consumer's household when hired to be a live-in employee, does not have a bifurcated relationship with the consumer. In those circumstances, all services the direct care worker provides fall within the employment relationship between the consumer and worker and between any third party employer and the worker; therefore, if those direct care services do not fall under the companionship services exemption, they must be compensated as required under the FLSA. By contrast, if the consumer and caregiver enter into a new family relationship during the course of an employment relationship (e.g., through marriage or civil union), then, although the family relationship did not predate the employment relationship, the bifurcated analysis described above would apply.

Additionally, the discussion above applies to third party employers that administer or facilitate the administration of certain Medicaid-funded or certain other publicly funded home care programs. These entities may be public agencies that run such programs or private organizations that have been designated to play a role in the functioning of the programs. These entities may benefit from this unique analysis only because of the entanglement with the special relationships between family and household members that necessarily result from the selection of family and household members as paid care providers through certain Medicaid-funded or certain other publicly funded programs.

Furthermore, the Department emphasizes that under this bifurcated analysis, the employment relationship is limited to the paid hours contemplated in the plan of care or other written agreement developed and approved by certain Medicaid-funded or certain other publicly funded home care programs only if that agreement is reasonable. As noted above, a determination of reasonableness will take into account whether the plan of care would have included the same number of paid hours if the care provider had not been a family or household member of the consumer. In other words, a plan of care that reflects unequal treatment of a care provider because of his or her familial or household relationship with the consumer is not reasonable. For instance, the program may not reduce the number of paid hours in a plan of care because the selected care provider is a family or household member. For example, an older woman who can no longer care for herself may enroll in a Medicaid-funded program. The program is administered by the county in which she lives and she has been assessed to need paid services for 30 hours per week beyond the existing unpaid assistance she receives from her daughter and other relatives. If the hours in the plan of care are reduced by the county to 15 hours per week because the woman's daughter is hired as the paid care provider, the paid hours in the plan of care do not reflect the economic reality of the employment relationship and therefore will not determine the number of hours that must be paid under the FLSA. In addition, a program may not require an increase in the hours of unpaid services performed by the family or household care provider in order to reduce the number of hours of paid services. See 42 CFR 441.540(b)(5) (mandating that as to certain types of Medicaid-funded home care programs, unpaid services provided by a family or household member "cannot supplant needed paid services unless the . . . unpaid [services] . . . are provided voluntarily to the individual in lieu of an attendant"); Final Rule, Medicaid Program; Community Choice First Option, Centers for Medicare and Medicaid Services, 77 FR 26828, 26864 (May 7, 2012) (explaining that unpaid services "should not be used to reduce the level of [paid] services provided to an individual unless the individual chooses to receive, and the identified person providing the support agrees to provide, these unpaid [services] to the individual in lieu of a paid attendant"). Although the Department distinguishes between an unpaid familial or household relationship and a paid employment relationship between family and household members, it does not condone or intend to overlook subterfuges that may seek to treat family members less equally. This interpretation may not be used in a manner that interferes with the ability of all direct care workers to enjoy the full protections of the FLSA.

The "economic realities" analysis also applies to certain private pay home care situations, such as those funded by long-term care insurance, where a family or household member is paid for home care services. Specifically, where a program permits the selection of a family or household member as a paid home care provider, if a familial or household relationship existed prior to and separate and apart from any employment relationship, use of the bifurcated application of the economic realities test would be appropriate. Application of the factors for applying *60490 the economic realities test in the family domestic service employment context described earlier in this section could lead to the conclusion that some of the hours of caregiving are part of an employment relationship and some hours are part of a familial or household relationship. How the divide between the two relationships is determined may vary depending on the structure of each program but, as in certain Medicaid and certain other publicly funded programs described above, the Department would look to a written agreement that reasonably sets forth the number of hours for which paid home care services will be provided.

*FLSA "Hours Worked" Principles*
Although the Department did not propose any changes to its existing rules defining what are considered hours worked under the FLSA, many commenters asked how the hours worked principles under the FLSA apply to domestic service employment. For instance, many commenters raised questions about when domestic service employees are considered to be working even though some of their time is spent sleeping, traveling, eating, or engaging in personal pursuits. The Department emphasizes that its regulations regarding when employees must be compensated for sleep time, travel time, meal periods or on-call time were not a part of this rulemaking, and they are unchanged by this Final Rule. Domestic service employees who do not qualify for the companionship services exemption or the live-in domestic service employee exemption are subject to existing rules on how to calculate hours worked, like any other employee covered under the FLSA. To address commenters' questions, however, the Department is providing the following guidance regarding the Department's established rules on compensable hours worked.

| | |
|---|---|
| 221 | SBA, A Guide for Government Agencies: How to Comply with the Regulatory Familiarization Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272. June 2010. pgs 47-58. Available at: www.sba.gov/advo. |
| 222 | Office of the Actuary, Centers for Medicare & Medicaid Services, U.S. Department of Health & Human Services. 2012 Actuarial Report on the Financial Outlook for Medicaid. Available at: http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/medicaid-actuarial-report-2012.pdf. Accessed April 17, 2013. |
| 223 | Kaiser Commission on Medicaid and the Uninsured. 2012 Medicaid Home and Community-Based Services Programs: 2009 Data Update. http://statehealthfacts.org/comparetable.jsp?ind=242&cat=4.<br>FN224 Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011-2021. Available at: http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf. |
| 225 | In 2009, the NHE listed total home health care expenditures as $66.1 billion, $29.9 billion (45 percent) of which were accounted for by Medicare, $24.3 billion by Medicaid (37 percent), with the remainder attributed to a mix of other government programs, private insurance, and private out-of-pocket spending. The Department calculated its adjusted Medicaid percent of expenditures by adding $25.7 billion ($50.0 billion minus $24.3 billion) to both total and Medicaid expenditures, then dividing $50.0 billion by $91.8 billion ($66.1 billion plus $25.7 billion) to estimate that roughly 54.5 percent of home care expenditures may be attributable to Medicaid.<br>FN226 Office of the Actuary, Centers for Medicare & Medicaid Services, United States Department of Health & Human Services. 2012 Actuarial Report on the Financial Outlook for Medicaid. Available at: http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/medicaid-actuarial-report-2012.pdf. Accessed April 17, 2013.<br>FN227 Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011-2021. Available at: http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf. |
| 228 | Real Gross Domestic Product for the first quarter of 2012 was $15.454 trillion. Bureau of Economic Analysis, News Release: National Income and Product Accounts Gross Domestic Product, 1st quarter 2012 (second estimate); Corporate Profits, 1st quarter 2012 (preliminary estimate). Available at: http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm. |
| 229 | BLS Quarterly Census of Employment and Wages: 2011 Annual employment for NAICS 62 (18,368,506). Total annual employment in 2011 for NAICS 6216 (HHCS) and 62412 (SEPD) was 1,912,306. Available at: http://www.bls.gov/cew/#databases. |
| 230 | WHD-2011-0003-9531.<br>FN231 WHD-2011-0003-6166.<br>FN232 WHD-2011-0003-9232. |

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.