IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

R. ALEXANDER ACOSTA, Secretary of Labor, )
)
        Plaintiff, )
)
        v. )      1:18-cv-549 (LMB/IDD)
)
AT HOME PERSONAL CARE )
   SERVICES LLC, et al., )
)
        Defendants. )

## MEMORANDUM OPINION

     R. Alexander Acosta, the Secretary of Labor ("plaintiff" or the "Secretary"), brings this

civil action under the Fair Labor Standards Act ("FLSA" or the "Act") against At Home Personal

Care Services LLC ("AHPC") and its owner, Robin Wright ("Wright"). AHPC provides

in-home personal care services for individuals enrolled in Medicare and/or Medicaid. The

Secretary claims that AHPC and Wright (together, "defendants") violated the FLSA by failing to

pay time-and-a-half overtime compensation to 44 personal care aides ("PCAs" or "aides")[1] listed

in Schedule A, which is attached to the Secretary's complaint, and by failing to maintain

accurate employee workweek records. The Secretary seeks back pay, liquidated damages, and

an injunction barring defendants from violating the Act in the future. In response, defendants

argue that at least some of the workers in question were independent contractors during the

relevant time period and thus were not "employees" covered by the FLSA's overtime provisions;

that Wright is not liable as an "employer" under the Act; that AHPC maintained adequate

---

[1] Although the individuals listed in Schedule A are variously referred to as personal care aides, home health aides, companions, and certified nursing assistants, the terms "PCA" and "aide" are used interchangeably throughout this Memorandum Opinion to refer to all workers who provide low-skilled, nonmedical companionship services in patients' homes.

records; that the Secretary's back pay calculations are excessive; and that it would be inappropriate to award liquidated damages or injunctive relief.

A two-day bench trial was held in March 2019.[2] For the reasons stated below, judgment will be entered in favor of the Secretary, and defendants will be held jointly and severally liable for back pay and liquidated damages in a total amount of $128,445.80.

## I. BACKGROUND

### A. Statutory and Regulatory Background

This litigation stems from a dramatic shift in the treatment of third-party providers of home care services like AHPC. In 1974, Congress amended the FLSA to cover domestic service employees, see Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 7(a), 88 Stat. 55, 62 (codified at 29 U.S.C. § 202(a)), but exempted from the Act's overtime compensation requirements "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves," id. § 7(b)(3) (codified at 29 U.S.C. § 213(a)(15)). Congress expressly delegated to the Department of Labor ("DOL") the responsibility for defining the terms relevant to that exemption, see 29 U.S.C. § 213(a)(15), and the DOL did so the following year, defining "domestic service employment" as "services of a household nature performed by an employee in

---

[2] The Secretary filed his initial complaint in May 2018. In August 2018, after defendants had moved to dismiss for failure to state a claim, the Secretary filed an amended complaint, and defendants consented to having their motion to dismiss denied as moot. Defendants never renewed their Rule 12(b)(6) motion, and the case proceeded to discovery. In late January 2019, two weeks after the final pretrial conference and less than two months before trial, defendants moved for judgment on the pleadings under Rule 12(c), reiterating many of the same arguments they had presented in their original motion to dismiss. The Court denied that motion on February 22, 2019. The Court also denied the Secretary's motion for summary judgment after finding that there were genuine issues of material fact as to both liability and damages.

or about a private home," Application of the Fair Labor Standards Act to Domestic Service, 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (codified at 29 C.F.R. § 552.3). The DOL also defined "companionship services" as "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs," id. (codified as amended at 29 C.F.R. § 552.6). Importantly, the 1975 regulations stated that "[e]mployees who are engaged in providing companionship services . . . and who are employed by an employer or agency other than the family or household using their services . . . are exempt from the Act's minimum wage and overtime pay requirements," id. at 7407 (codified at C.F.R. § 552.109(a) (amended 2013)). Under the 1975 regulations, third-party employers like AHPC were exempt from the FLSA's overtime compensation provision.

In 2013, the DOL substantially amended the governing regulations. Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454 (codified at 29 C.F.R. pt. 552). Those amendments, which became effective on January 1, 2015, see id. at 60,455, were consequential for companies like AHPC for multiple reasons. They restricted the definition of "companionship services," making clear that the term "does not include the performance of medically related services" and instead applies only to "the activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring)," id. at 60,557 (codified at 29 C.F.R. § 552.6). More significantly, they reversed course and provided that "[t]hird party employers of employees engaged in companionship services . . . may not avail themselves of the . . . [§ 213(a)(15)] exemption . . . , even if the employee is jointly employed by the individual or member of the family or household using the services," id. (codified at 29 C.F.R. § 552.109(a)) (emphasis added). The DOL explained that because structural changes in the home care industry had expanded the number of large, professionalized companies claiming the

3

companionship services exemption, it was necessary to adjust the regulations "[t]o better ensure that the domestic service employees to whom Congress intended to extend FLSA protections in fact enjoy those protections." Id. at 60,455; see also id. at 60,460 (emphasizing the "high percentage of home care workers employed by third parties or agencies"); id. at 60,481-83 (further explaining the reasons for the change).[3]

The DOL's decision to withdraw from third-party employers such as AHPC the ability to claim the companionship services exemption is relevant both for understanding defendants' actions giving rise to this litigation and in assessing whether the PCAs at issue are "employees" subject to the FLSA's requirements.

## B. **Factual Findings**

AHPC is a limited liability company organized under Virginia law with a principal place of business in Manassas, Virginia. During the period relevant to this litigation—which the parties stipulate runs from January 26, 2016 through October 1, 2017—AHPC was an enterprise whose employees were engaged in commerce and which had an annual gross volume of business of at least $500,000. See Order [Dkt. No. 71] 1 n.1.

AHPC provides in-home healthcare and personal care services to individuals enrolled in Medicare and/or Medicaid. When an eligible patient signs up with AHPC, the company develops a plan of care and schedule for providing the services to which the patient is entitled. The PCAs at issue in this litigation—who account for roughly 40% of AHPC's revenues—

---

[3] Defendants have not argued that the regulations were unlawful and have conceded that they cannot claim the § 213(a)(15) exemption. Cf. Home Care Ass'n of Am. v. Weil, 799 F.3d 1084, 1086-87 (D.C. Cir. 2015) (holding that the Department's decision not to apply the exemption to employees of third-party agencies was "grounded in a reasonable interpretation of the statute and [was] neither arbitrary nor capricious"), cert. denied, 136 S. Ct. 2506 (2016).

provide a variety of services, including bathing, dressing, grooming, light cleaning, cooking, feeding, accompanying patients on errands, and otherwise assisting patients with day-to-day activities. Although the work they perform requires a high degree of attention, care, and discretion, PCAs are generally considered low-skilled workers and are typically paid at a rate between $9 and $11 per hour.

How PCAs come to AHPC and receive assignments can vary significantly. Some apply to AHPC as individuals, hoping that the company will match them with patients. These PCAs do not have preexisting relationships with the patients they serve and often work for multiple patients during their tenure, sometimes attending to more than one patient during a given week. When a patient passes away, loses his entitlement to personal care, or otherwise stops needing personal care services, AHPC attempts to reassign the aide to a new patient with a plan of care and schedule that fits the aide's scheduling needs. Other PCAs apply to AHPC based on preexisting relationships they have with Medicare- or Medicaid-eligible patients. Some of the aides come to AHPC from another third-party provider of home services, and some of these aides bring their patients along with them. PCAs may even be family members or close friends of the patients they serve and may have no interest in caring for anyone else. Indeed, several of the PCAs in this case provided services only for family members, had no prior history of working as PCAs, and will cease working in that capacity when their services are no longer required by their family members.

Regardless of these differences, all of AHPC's PCAs are subject to the same set of policies and practices. Each is given a copy of the AHPC employee manual, see PLEX 11,[4] and

---

[4] The version of the manual submitted into evidence by the Secretary is missing a page: Between the seventh and eighth pages of the document, the Bates numbers jump from AHPC 003299 to 003301. Although defendants' version of the employee manual was not

asked to fill out a signed verification that she has reviewed its contents. Before they can be assigned to work for any patients, PCAs must undergo an orientation and training program designed to familiarize them with common challenges and best practices for providing in-home care services and must complete monthly online continuing education programs offered through AHPC's workers' compensation policy, which covers all of the PCAs. The same timekeeping procedure applies to all PCAs. Under this procedure, PCAs virtually clock in and out when they arrive at or leave a patient's home,[5] and each Monday, they are responsible for dropping off with AHPC's human resources department "provider aide records"—which throughout this litigation were referred to as "timesheets"[6]—indicating the number of hours and tasks performed for each patient on a day-by-day basis. See, e.g., PLEX 24. Failure to submit provider aide records in a timely fashion can lead to disciplinary action. See, e.g., PLEX 19.

AHPC processes payroll and billing as follows. Each day, the company's human resources department monitors the Kinnser data to ensure that all PCAs have reported for their

_____

formally introduced into evidence, testimony at trial revealed that the Secretary had omitted the page outlining AHPC's policies with respect to independent contractors. That page is of course germane to the central dispute in this litigation. This omission, whether due to gamesmanship or oversight, was unfortunate.

[5] AHPC installed a timekeeping system called Kinnser in March 2016—roughly two months into the relevant period in this litigation—in response to complaints that PCAs were failing to show up to their assignments consistently and on time. Although the Kinnser system does not use geolocation and thus does not itself guarantee that an aide is at a patient's home, it enables more immediate monitoring of scheduling issues and has led to a reduction in these complaints.

[6] The term "timesheet" is misleading. Provider aide records are maintained by patient, not by aide. For example, if an aide performed in-home services for two patients in one week, a single record would not display all the aide's hours worked. Instead, to have an accurate picture of the hours worked that week, the two provider aide records would have to be combined. In addition, AHPC uses a separate, orange-colored form for "respite care"—that is, temporary care designed to relieve a usual caregiver, see Respite Care, Medicare.gov, https://www.medicare.gov/node/32506 (last visited Apr. 11, 2019). As a result, respite care hours are not included in the snapshot provided by a single provider aide record.

assignments. If an aide forgets to clock in or out through Kinnser, she is contacted to make sure she is following the appropriate schedule. On a weekly basis, human resources staff collects the PCAs' provider aide records, works to correct any apparent issues with those records,[7] and combines the hours worked by each PCA in each week into a single, consolidated spreadsheet known as a "worksheet summary." See PLEX 2. What complicates the recordkeeping in this case is that the provider aide records are placed in each patient's individual files, as required by Medicare and Medicaid regulations. AHPC does not keep separate copies of the records arranged by aide. The worksheet summaries are then forwarded to the payroll department. PCAs are paid every two weeks based on the hours reported on the worksheet summaries, and the record of those biweekly payments are maintained in the company's ADP system. See PLEX 8. Because PCAs are sometimes late in submitting their provider aide records, they are often compensated for services performed in previous pay periods. Separately, AHPC bills Medicare and Medicaid directly on behalf of the patients. If AHPC over- or underbills for a given time period, Medicare and Medicaid regulations allow it to adjust the relevant amounts retroactively.

PCAs have limited flexibility with respect to how they go about their duties. They must perform the required tasks listed in each patient's plan of care and cannot be paid for activities or hours beyond that plan because AHPC cannot bill Medicare or Medicaid for those additional services or hours. Although AHPC can recommend that a patient receive an increase in hours or additional services, those decisions are ultimately made by insurance companies, and the PCAs

---

[7] During her pretrial deposition, Wright indicated that provider aide records require correction roughly 20% of the time. At trial, she clarified that these issues had become more infrequent due to AHPC's adoption of the Kinnser system.

must abide by those decisions. If a PCA is unable to work an assigned shift, she must inform AHPC and cannot arrange for a substitute on her own. Failure to provide notice of unavailability or adequate documentation can lead to disciplinary action. See, e.g., PLEX 12 (indicating that a PCA was terminated because she failed "to bring in a medical clearance to return to work, per company policy," after being injured in a car accident). PCAs also have little room to bargain for a given rate; although AHPC will on occasion pay a higher rate for an undesirable assignment such as a patient who lives in a remote area, PCAs are otherwise assigned a rate upon hiring that typically remains stable even if the aide changes assignments or works for a number of years. When a PCA's assignment ends, she must wait for AHPC to reassign her to another patient, a process that can take weeks. And a PCA may not be compensated if she fails to remain in compliance with AHPC policies—many of which stem from Medicare or Medicaid requirements—relating to training, vaccinations or immunizations, certifications, and the like. See, e.g., PLEX 24 (indicating that a PCA was not paid for services rendered because she "had no TB," which refers to a vaccine for tuberculosis).

Before 2015, all PCAs working for AHPC were treated as employees for tax purposes. Their earnings were reported on W-2 forms, and taxes were withheld. Things changed after the DOL issued the new regulations establishing that third-party home care companies could no longer claim the FLSA exemption for domestic workers providing "companionship services." Initially, AHPC's governing board determined that due to this change, the company would be "require[d] to pay all companions, [home health aides], [and certified nursing assistants] overtime," or else alter the aides' schedules "to accommodate the 40 hour work week requirement." PLEX 10, at 1.

AHPC subsequently decided to reclassify PCAs as "independent contractors." In AHPC's view, once reclassified, if a PCA worked more than 40 hours in a week, she would not have to be paid overtime, but rather could be paid at her normal hourly rate. AHPC did not seek guidance from an attorney or from the DOL before making this decision. The only investigation involved defendant Wright's going to the DOL's website, after which she concluded that at least some of the PCAs qualified as independent contractors under the applicable standards—a conclusion she shared with her accountant in seeking advice on the tax consequences of reclassification.

Sometime in 2015, AHPC held a meeting with its PCAs to discuss the possibility of changing their classifications. Many of the PCAs testified that they did not understand, or were never given a meaningful explanation of, any bona fide difference between working as an employee and working as an independent contractor. Instead, they focused only on the consequences of being reclassified, which many understood would allow them to continue to work more than 40 hours per week without receiving permission from the company. They also understood that that they would have to set aside part of their wages to pay taxes. One aide, for instance, described the reclassification effort as a change in AHPC's "pay system," and another indicated that it was simply a matter of shifting the burden of withholding taxes from AHPC to the PCAs.

Whatever their understanding, many PCAs took part in the reclassification.[8] AHPC provided those "independent contractor" PCAs with W-9 forms and helped them fill out the

---

[8] There was conflicting testimony with respect to whether the PCAs were given a genuine choice to switch classifications. Some testified that they understood that they were free to switch back and forth between employee and independent contractor status as they wished. Others were more equivocal, stating that the reclassification was presented to them as a final decision that

forms, instructing them to list "At Home Personal Care" as their "[b]usiness name" and to check the "[i]ndividual/sole proprietor or single-member LLC" box. See DEX 9 (containing W-9 forms for over 20 of the PCAs). AHPC then began reporting the compensation for those PCAs on 1099-MISC forms rather than on the traditional W-2 forms. See DEX 9R. Although most of the reclassified PCAs continued to operate as "independent contractors" until the end of the relevant period, several opted to switch back to the "employee" classification, typically because they felt it was too inconvenient or confusing to set aside taxes for themselves. Without exception, all the aides who testified at trial indicated that other than the tax-, compensation-,[9] and schedule-related consequences of the reclassification, there was no difference in the duties they performed or how they interacted with AHPC before and after being reclassified.

Defendant Wright is AHPC's president and director of nursing, and during the relevant period she held a 100% ownership interest in AHPC. Although Wright does not actively participate in every aspect of the company, she is intimately involved with setting and implementing many of AHPC's policies and procedures for PCAs. For example, she is in charge of the process of hiring new PCAs, conducts the orientation and training once an aide is set to begin work, collaborates with new patient clients to develop the schedules and plans of care that will govern the PCAs' day-to-day responsibilities, and sets each aide's rate of pay based on an

---

would go forward unless an objection was raised. Still others suggested that they were simply told they would be reclassified and were not given any choice at all.

[9] In addition to "independent contractor" PCAs' being able to work more than 40 hours per week without securing AHPC's advance consent, there was some testimony at trial that the reclassification was accompanied by a change in PCAs' hourly rates, with independent contractors receiving a higher rate. Although most of the PCAs who testified had foggy recollections of their hourly rates over the years—and others stated that they were paid the same rate both before and after reclassification—some did indicate that their pay rates dropped once they were reclassified as employees after the DOL investigation began.

analysis of prevailing Medicare and Medicaid rates and the company's costs. She also oversees the human resources personnel in charge of the scheduling and payroll processes. Although staff coordinator Elizabeth Mendez ("Mendez") is responsible for day-to-day supervision of employees' hours and submission of provider aide records,[10] Mendez made clear at trial that she communicates any issues that cannot be immediately resolved up the chain of command to Wright, who is ultimately responsible for ensuring that AHPC's billing practices comply with Medicare and Medicaid requirements. Wright is also directly involved in disciplinary actions taken against employees who fail to abide by timekeeping or other rules. See, e.g., PLEX 19 (showing that Wright signed a PCA's disciplinary record as the "[s]upervisor"); PLEX 12 (containing, among other documents, a record of disciplinary action signed by Wright faulting a PCA for bringing her dog to a patient's home; forms signed by Wright denying approval for several requests made by a PCA to "call out" of a care assignment; and several reports completed by Wright assessing a PCA's work performance); see also PLEX 20, at 1 (showing that Wright signed a request for time off as the PCA's "[s]upervisor").

Wright was the point person for AHPC when the DOL sent Rhonda Roberts ("Roberts"), a Wage and Hour Investigator, to look into the company's overtime compensation practices in the summer of 2017. See PLEX 7. Roberts met with Wright to discuss AHPC's classification of some PCAs as "independent contractors," informing Wright that she felt the classification was inappropriate and accordingly that the aides were not being paid overtime to which they were

---

[10] Mendez's duties were formerly handled by Shayla McCall, who was terminated due to problems with her computation of the number of hours each aide had worked. Defendants also claimed that McCall had deleted employee records to which she had electronic access, including (as relevant to this litigation) worksheet summaries for the period from January through September of 2016. As a result, she was charged with a misdemeanor offense in Prince William County, Virginia.

entitled. Roberts recommended that the "independent contractor" PCAs be immediately reverted to employee status. AHPC complied, although many of the aides were furious about the change.[11] Roberts also worked with Wright to collect worksheet and payroll summaries for the period under investigation in preparation for calculating back wages due under the Act.

Since October 2017, in an effort to comply with the DOL's guidance, AHPC has treated all PCAs as employees, paying time-and-a-half compensation for hours worked over 40 in a workweek. See PLEX 27, at 6.

## II. ANALYSIS

The Secretary claims that defendants violated the FLSA in two ways: (i) by failing to pay the requisite time-and-a-half overtime compensation to PCAs who worked more than 40 hours in a workweek, in violation of 29 U.S.C. § 207; and (ii) by failing to maintain adequate employee records in accordance with 29 U.S.C. § 211. Each claim is addressed below.

### A. Overtime Compensation

The FLSA is designed to combat "conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). One of the principal evils the Act was intended to remedy is "the imposition of lengthy hours of work at low wages." Marshall v. W. Union Tel. Co., 621 F.2d 1246, 1250 (3d Cir. 1980). Accordingly, with a few exceptions, any covered employee who

---

[11] Wright offered several reasons why many PCAs did not want to be returned to employee status. For one thing, some would lose money as a result, either because their pay rates would be decreased or because the company was unwilling (or could no longer afford) to let them work more than 40 hours per week. For another, patients eligible for more than 40 hours of care per week tend to prefer receiving care from one consistent PCA, but the reclassification would require AHPC to arrange for substitute aides once the primary caretaker reached 40 hours, giving rise to a possibility of disruptions in care. Whatever the reason, over 10 PCAs decided to leave AHPC after the company's decision to revert their classifications to "employee."

works more than 40 hours in a workweek must "receive[] compensation for his employment in excess of [40] hours at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Ensuring adequate overtime compensation has two salutary effects: It "compensate[s] those who labor[] . . . for the wear and tear of extra work and . . . spread[s] employment [by] inducing employers to shorten hours because of the pressure of extra cost." Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 460 (1948).

Defendants concede that all but 5 of the 44 aides in Schedule A worked at least some overtime for which they were not compensated at a time-and-a-half rate.[12] Nonetheless, they seek to limit their liability under § 207 in four ways. First, they argue that roughly one-quarter of the aides are not covered by the FLSA's overtime provision because they are properly classified as independent contractors. Second, they claim that the Secretary's back wages calculation rests on unreliable documents and results in an inflated total. Third, they argue that liquidated damages are not appropriate in this case or, alternatively, that such damages should be granted as to some PCAs but not to all. Finally, they contend that Wright is not individually liable for any damages as an "employer" under the FLSA. None of defendants' arguments is availing.

### 1. The Employee–Independent Contractor Distinction

#### i. Legal Principles

The FLSA imposes obligations on "employers" with respect to their "employees" but does not reach beyond employment relationships. Under the act, "employee" is defined as "any

---

[12] Defendants argue that Roxana Arita, Queenempress Brent, Persable Edwards, Lucilla Mayorga, and Amy Wadlow worked no overtime hours during the relevant period. Dkt. No. 84-1. Conversely, the Secretary asserts that these employees did work overtime hours during that period and calculates that, together, they are entitled to $1,213 in back wages. See PLEX 3. For the reasons discussed below, the Court adopts the Secretary's figures and thus finds that these five aides are also entitled to back wages.

individual employed by an employer," 29 U.S.C. § 203(e)(1); "employer is defined to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee," id. § 203(d); and "employ" is defined to "include[] to suffer or permit to work," id. § 203(g). These notoriously circular definitions have prompted the courts to fill in the contours of which workers qualify as employees such that they enjoy the Act's protections. The term "employee" has generally been given broad construction, see Harbourt v. PPE Casino Resorts Md., LLC, 820 F.3d 655, 658-59 (4th Cir. 2016), consistent with the principle that the FLSA is "remedial in nature" and thus must be construed "liberally, recognizing that broad coverage is essential to accomplish" the statute's goals, Schilling v. Schmidt Baking Co., 876 F.3d 596, 602 (4th Cir. 2017) (internal quotation marks and citations omitted). Nonetheless, that term "does have its limits," Steelman v. Hirsch, 473 F.3d 124, 128 (4th Cir. 2007) (citation omitted), and as relevant here does not extend to "independent contractors" who "work for their own advantage" rather than for the benefit of the putative employer, id. at 128-29 (citation omitted).

In deciding whether a worker is an "employee," and thus covered by the FLSA, rather than an "independent contractor" outside the Act's scope, "a court considers the 'economic realities' of the relationship between the worker and the putative employer." Salinas v. Commercial Interiors, Inc., 848 F.3d 125, 150 (4th Cir. 2017) (citation omitted). The touchstone of this inquiry is "whether the worker is economically dependent on the business to which he renders service or is . . . in business for himself." Id. at 150 (internal quotation marks and citation omitted). That question itself is assessed in light of six factors:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

14

Id. (citation omitted). No single factor is dispositive. McFeeley v. Jackson Street Entm't, LLC, 825 F.3d 235, 241 (4th Cir. 2016). Although the multifactor nature of the "economic realities" test creates a fair amount of indeterminacy, it also "allows for flexible application to the myriad different working relationships that exist in the national economy." Id.

### ii. Burden of Proof

Throughout this litigation, the parties assumed that defendants bore the burden of proving that the PCAs listed on Schedule A were independent contractors rather than employees. Both parties reaffirmed that assumption at trial. Yet this may be incorrect as a matter of law because there is confusion over where the concept of "independent contractor" fits within the FLSA framework.

The Act contains enumerated exemptions that limit an employer's overtime pay liability with respect to otherwise covered "employees" who satisfy one or more statutory criteria. See, e.g., 29 U.S.C. § 213(a)(1) (exempting "any employee employed in a bona fide executive, administrative, or professional capacity"); id. § 213(a)(8) (exempting "any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand"). A plaintiff must first make a showing of an employment relationship, after which "the burden shifts to the employer to establish whether one of the specific exemptions . . . applies." Briggs v. Chesapeake Volunteers in Youth Servs., Inc., 68 F. Supp. 2d 711, 714 (E.D. Va. 1999).[13] But independent contractor is not one of

---

[13] The employer must satisfy this burden by clear and convincing evidence, Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 691-92 (4th Cir. 2009), which reflects the longstanding principle that the Act's exemptions must be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit," Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). Although the Secretary initially argued that defendants bore the burden of proving that the Schedule A aides were independent contractors by clear and convincing evidence, see

the exemptions listed in the Act. Instead, if the worker in question is an independent contractor, there is no employment relationship to speak of, and the FLSA does not apply as a threshold matter.[14] Because it is the plaintiff's ultimate burden to demonstrate that the FLSA applies to the defendants and workers in question, Briggs, 68 F. Supp. 2d at 714, it may well be that it is the Secretary, not defendants, who bears the burden of establishing that the PCAs listed in Schedule A were not independent contractors. Some federal courts have followed this logic. See, e.g., Razak v. Uber Techs., Inc., No. 16-cv-573, 2018 WL 1744467, at *14 (E.D. Pa. Apr. 11, 2018) (concluding that the plaintiffs bore the burden of proving that the individuals at issue were employees rather than independent contractors), appeal docketed, No. 18-1944 (3d Cir. Apr. 27, 2018).[15] Other courts have taken a different approach. In Donovan v. Tehco, Inc., 642 F.2d 141 (5th Cir. Unit A 1981), for example, the court of appeals adapted the Mt. Clemons burden-shifting framework used for proof of damages in FLSA cases and held that the Secretary of

___

Reply in Opp'n to Defs.' Opp'n to Mot. for Summ. J. [Dkt. No. 69] 10-13, he changed his view at trial and agreed that only a preponderance of the evidence was required.

[14] Adding to the confusion, the concept of independent contractor is treated as an exemption in other areas of the law. See, e.g., Lawson v. GrubHub, Inc., 302 F. Supp. 3d 1071, 1083 (N.D. Cal. 2018) (discussing the California Labor Code, which places on the defendant the "burden of proving that [the worker] was an independent contractor rather than an employee"); see also Options for Senior Am. Corp. v. United States, 11 F. Supp. 2d 666, 668-69 (D. Md. 1998) (discussing the "safe haven" provision of the Revenue Act of 1978, under which the employer bears the "relatively low" threshold burden of demonstrating a "reasonable basis" for believing that a worker was an independent contractor, at which point the burden shifts to the government to refute the showing).

[15] Although the plaintiffs in Razak appealed the district court's order, they have not disputed its ruling that they bear the burden of showing that they are employees rather than independent contractors, see Brief of Appellants, Razak v. Uber Techs., Inc., No. 18-1944 (3d Cir. July 25, 2018), 2018 WL 3702070; Reply Brief of Appellants, Razak, No. 18-1944 (3d Cir. Oct. 15, 2018), 2018 WL 5268990, even after the defendants explicitly underscored that ruling in their brief to the Third Circuit, see Brief of Appellees at 23-24, Razak, No. 18-1944 (3d Cir. Sept. 24, 2018), 2018 WL 4760208.

Labor had introduced sufficient evidence "to shift the burden of produc[tion]" regarding the workers' alleged independent contractor status to the employer, id. at 144 (citing Anderson v. Mt. Clemons Pottery Co., 328 U.S. 680 (1946)). Ultimately, this question is not outcome determinative here because the Court concludes that the evidence in the record overwhelmingly establishes that the Schedule A aides were "employees" covered by the Act and thus entitled to be paid for any overtime work.

   iii. Application to this Dispute

  Although defendants initially contended that all aides listed in Schedule A were properly classified as independent contractors, they ultimately conceded that 30 of them were, in fact, employees covered by the Act,[16] leaving the status of only the following aides at issue: Joseph Ansah, Nana Achiaa Karikari Boateng,[17] Silvia Castillo, Caitlyn Chaus, Karla Cortez, Gabriel Daraie, Malessia Dawson, Jacqueline Dunkley, Minabelle Foading, Robin Heiden, Lucilla Mayorga, Mahin Miramini, Dijohn Nolen, and Ingrid Portillo.

  Applying the factors making up the economic realities test, the Court finds that all these PCAs were "employees" during the relevant period. First, AHPC exercised substantial control over the manner in which the PCAs worked. All were given an orientation and training on how to perform in-home personal care and had to undergo monthly refresher trainings to ensure they

---

[16] At trial, the Secretary called several current or former AHPC aides as witnesses only to have defendants announce that they were conceding those aides' status as employees. Accordingly, at the Court's prompting, counsel for defendants asked Wright for a complete list of every PCA who defendants maintained was an independent contractor. After Wright identified only 14 of the aides, the Court made clear that defendants would be held to their concession as to the other 30's employee status, and counsel for defendants did not object or identify any additional PCAs as independent contractors.

[17] Wright stated that Boateng "maybe" qualifies as an independent contractor. She has been included in the list of contested aides out of an abundance of caution.

continued to conform to best practices. They were subject to discipline if they failed to perform the services in accordance with the company's rules and with applicable Medicare and Medicaid regulations. Second, the evidence does not suggest that any of these PCAs had substantial "opportunities for profit or loss dependent on his managerial skill"; to the contrary, the PCAs were low-skilled workers who worked alone and had little bargaining power. Although the evidence at trial showed that some of the PCAs switched from one third-party provider to another, that mobility does not suggest they were capable of the type of profit-generation captured by the second factor. Third, the PCAs at issue did not "invest[] in equipment or material"—indeed, the only "equipment" discussed at trial was the rubber gloves that AHPC provides to all aides, regardless of classification—and the PCAs were prohibited from hiring others to perform the services for which they were compensated. Fourth, although the Court does not doubt the expertise or discretion required to render personal care services, the PCAs at issue were (in traditional terms) low-skilled workers.[18] Fifth, although the PCAs often worked in time-limited capacities—both because the plans of care under which they worked had to be periodically reevaluated and because the patients for whom they cared could change—they did not work in the temporary, project-related capacity typically associated with independent contracting. Finally, there can be no doubt that the services rendered by the PCAs at issue were "an integral part of [AHPC's] business": AHPC is a provider of at-home healthcare and personal care services, and PCAs generate approximately 40% of the company's total revenues. In sum,

---

[18] "Although certain highly specialized job skills support independent contractor classification, '[s]kills are not the monopoly of independent contractors,' as all jobs require some modicum of skill." Perez v. Super Maid, LLC, 55 F. Supp. 3d 1065, 1077 (N.D. Ill. 2014) (alteration in original) (quoting Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1537 (7th Cir. 1987)). Accordingly, although this factor remains part of the Court's consideration, it is of somewhat lesser probative value.

each of the six factors under the economic realities test weighs in favor of finding that the contested PCAs were "employees" subject to the FLSA's protections.

Likewise, the Court concludes that the PCAs in question were not genuinely "in business for [themselves]." The aides were instructed to list "At Home Personal Care" as the name of their business when they filled out W-9 forms. No aide testified that she considered herself to be the owner of AHPC or of any other form of recognized one-person business. Defendants did elicit testimony that some PCAs worked for more than one third-party company at the same time as they worked for AHPC, but as one aide explained, that was to avoid putting all eggs in one basket given the scheduling irregularities and occasional disruptions in assignments that are an unavoidable part of the in-home personal care industry. But this proves no more than that some PCAs chose to have multiple employers at the same time. It does not defeat the conclusion that the PCAs in question were employees rather than independent contractors.

Defendants resist this conclusion and advance several arguments why at least some of the PCAs were independent contractors not subject to the FLSA. None is persuasive. First, defendants argue that Medicare and Medicaid requirements restrict AHPC's range of options in many respects—for example, by limiting the number of hours of care for which the company may be compensated, the types of services to which each patient is entitled, and the certifications and immunizations each aide must possess. Defendants maintain that these regulatory restrictions demonstrate that AHPC lacks a measure of control over its PCAs. But this argument does not help defendants. That an industry is heavily regulated does not mean that those working in the industry are not "employees." And that the company's range of options is somewhat restricted does not change the fact that it remains in control of the PCAs' day-to-day work. Medicare and Medicaid may place a ceiling on how much AHPC may be compensated for

the services performed by the PCAs, but it is AHPC that determines each aide's pay rate based not only on that ceiling but also on the company's other costs. Medicare and Medicaid may determine a patient's eligibility for services and hours, but AHPC trains its PCAs as to how to perform those services and goes to great lengths to ensure that the PCAs provide those services and work within the allotted hours. Medicare and Medicaid may establish requirements that every aide must satisfy, but it is AHPC that communicates those requirements to the PCAs and that disciplines those who fail to remain in compliance. Finally, these regulatory requirements apply equally to all PCAs working for AHPC, not merely those who defendants maintain are independent contractors. By conceding an employment relationship as to the majority of the Schedule A aides, defendants have necessarily undercut their own argument based on the regulatory requirements.

Second, defendants argue that at the very least, PCAs performing services exclusively for family members are not "employees." This mode of work does not fit neatly within any classic conception of employment. Several aides testified that they perform services for their loved ones out of a sense of familial obligation, not a desire for pecuniary gain, and would provide those services whether or not they were compensated. Many had no previous desire to work as PCAs and said they would cease working in that capacity in the event their family members no longer required assistance. Some, such as Mahin Miramini, even live in the home where they provide services. Such workers are different from those who clock in an out of an office each day—and even from the PCA who reports to an unrelated patient's home to perform services and then heads home once her shift is complete.

But those differences do not have legal significance, at least with respect to the question of FLSA coverage. The FLSA is not limited to traditional or common forms of employment;

rather, the Act's language is sweeping precisely because it is meant to capture a broad array of employment relationships in an ever-changing economy. Whatever feelings of love or obligation may have motivated the PCAs at issue to care for elderly or disabled family members, they also decided to enter into a mutually beneficial arrangement with AHPC, one in which they received compensation from AHPC. In so doing, they continued helping their loved ones but also received payment, training, and the institutional support AHPC provided. In return, AHPC profited by billing for the services those PCAs provided and, as a side benefit, their patients reaped the benefits of obtaining care through a professionalized company from a loved one rather than a stranger. This arrangement constituted an employment relationship between the PCAs and AHPC.[19]

---

[19] After the first day of trial, the Court asked for supplemental briefing on the question whether those who performed services only for family members could be considered "employees" under the FLSA. The Secretary responded [Dkt. No. 114] with two arguments. First, he pointed out that the text of the Act does not expressly exempt familial employment relationships from its coverage. Second, the Secretary directed the Court to out-of-circuit case law holding that the existence of a familial relationship does not itself preclude an individual "from being an employee under the FLSA as a matter of law." Velez v. Sanchez, 693 F.3d 308, 327 (2d Cir. 2012); see also id. at 328 ("[T]he existence of [a familial] relationship, or some motivation to work in addition to material gain, does not preclude the application of the FLSA. . . . The line between member of the household and employee becomes especially difficult to discern in the domestic worker context because . . . the work of a domestic service employee would otherwise be carried out in most homes by the family members themselves if the family could not afford to pay outside help. However, Congress chose to provide protections for those workers who are not providing that service in the course of purely familial duty . . . ." (internal quotation marks and citation omitted)).

The Court gave defendants an opportunity to respond to these arguments at the outset of the second day of trial. Although counsel for defendants correctly stated that Velez was factually distinguishable from this case, see, e.g., id. at 314-16 (describing the factual background of the case, one in which the plaintiff brought claims not only under the FLSA but also under the Alien Tort Statute, alleging that she had been subjected to "involuntary servitude, slavery, [and] forced labor"), he did not otherwise counter the Secretary's arguments or produce case law supporting defendants' view of the employee–independent contractor distinction.

Finally, defendants assert that the PCAs who provided services only for family members were often more difficult to control, largely because they viewed themselves as working primarily for their relatives and did not as readily submit to AHPC's rules. Wright testified that such aides were more likely to leave AHPC if they and their relatives found a more beneficial arrangement with another company. But this does not alter the fundamental fact that these aides were AHPC's employees. All this argument shows is that PCAs who perform services only for family members are employees who are comparably more difficult to control or retain, which makes them indistinguishable from other at-will employees who, because of limited skills or their circumstances, are only willing or able to work in circumscribed ways.

In sum, the Court finds that all of the aides listed in Schedule A were "employees" entitled to the protections of the FLSA. Defendants have conceded that during the relevant period, when these aides worked more than 40 hours in a workweek, they were not compensated at a time-and-a-half rate. Accordingly, those aides are entitled to back wages under 29 U.S.C. §§ 207 and 216.[20]

2. Back Wages

In light of the finding that back wages are due, the correct amount of those wages must now be decided. This calculation remained a hotly contested issue throughout this litigation.[21]

---

[20] Section 216 authorizes the Secretary to "bring an action in any court of competent jurisdiction to recover the amount of unpaid . . . overtime compensation." 29 U.S.C. § 216(c). Thus, although it is the Schedule A employees who are entitled to compensation, the Secretary is statutorily entitled to seek it and must pass along any sums recovered "directly to the employee or employees affected." Id.

[21] In January 2019, the Secretary moved for sanctions based on what he claimed was defendants' continued failure to produce a complete set of provider aide records covering the period relevant to this litigation. The Secretary argued that defendants' failure was particularly egregious in light of their insistence that the Secretary should have used those records in calculating back wages. The Court granted the Secretary's motion for sanctions in part, awarding attorney's fees

Defendants claim that the provider aide records are the most reliable source of data, and they object that the DOL's investigator, and subsequently the Secretary himself, relied instead on the worksheet and payroll summaries in calculating back wages. Defendants argue that as a result, the Secretary's calculation is overinflated by thousands of dollars. Compare PLEX 3 (calculating $64,222.90 in back wages), with Dkt. No. 84-1 (showing defendants' calculation, with one aide marked "TBD," of a total of $45,906.89).[22] The Secretary responds that the provider aide records are disorganized and incomplete, were not given to the DOL's investigator during the investigation,[23] and were not timely produced in discovery. The Secretary insists that his calculation remains the best possible estimation based on the information the DOL received from defendants. The Court agrees with the Secretary and will adopt his calculation.

---

related to the filing of the motion, but denied it in all other respects. The Secretary moved for clarification or reconsideration of the order denying the motion for sanctions in March 2019, protesting that defendants still had not produced a complete, organized set of the records. The Court denied the motion for clarification or reconsideration based on defendants' representation that all the records had been transmitted to the Secretary as of late February. Unfortunately, even as of the date of trial, the parties continued to dispute whether all the records had been turned over.

[22] Defendants never explained why they had not been able to calculate the back wages due to Karla Cortez for the 650 overtime hours she worked during the relevant period. Nor does the record disclose whether defendants ever performed that calculation.

[23] When Roberts visited AHPC in 2017, Wright stated that the provider aide records would give a complete account of each aide's hours worked on a daily and weekly basis. But Roberts did not collect those records for several reasons. First, the records were divided by patient, not by aide, and Roberts felt that compiling the information would not be an appropriate use of her time given the investigation's tight deadlines. Second, Wright expressed concerns that allowing the provider aide records to be taken away or copied could violate the privacy protections of the Health Insurance Portability and Accountability Act of 1996. Third, Roberts asked Wright to pull a sample set of provider aide records and, after reviewing this set, determined that the records were incomplete or inaccurate. Finally, Wright assured Roberts that the worksheet summaries, which were available for most (though not all) of the period under investigation, accurately reflected the contents of the provider aide records.

To be sure, there are reasons to doubt whether the Secretary's calculation is 100%
accurate. For the period from January through September of 2016, for instance, the Secretary
had to rely on the biweekly payroll summaries rather than the weekly worksheet summaries.
Because payroll summaries do not provide week-by-week data, the overtime hours those
summaries indicated may constitute an over- or underinflation of the true number of overtime
hours worked. Further, testimony at trial indicated that one aide who was simultaneously caring
for two patients in the same home was paid as if she had worked twice as many hours as she had;
that arrangement does not entitle her to overtime compensation under the FLSA.

Nonetheless, the Secretary's calculations need not be perfect for the Court to accept
them. In Mt. Clemens, the Supreme Court recognized that employer records are often
"inaccurate or inadequate" and that it may be difficult for employees to "offer convincing
substitutes." 328 U.S. at 687. Rather than allowing these difficulties to inure to the benefit of
employers who had violated the Act, the Court developed a burden-shifting framework for
damages in FLSA cases. An FLSA plaintiff need only make a prima facie showing that
compensation is due and that the estimated amount of damages is "a matter of just and
reasonable inference." Id. at 687-88. Once that initial showing is made, "[t]he burden then shifts
to the employer to come forward with evidence of the precise amount of work performed or with
evidence to negative the reasonableness of the inference to be drawn from the employee's
evidence." Id. "If the employer fails to produce such evidence, the court may then award
damages to the employee, even though the result be only approximate." Id.

The Secretary has more than satisfied his initial burden of demonstrating "just and
reasonable" damages. Roberts, the DOL's investigator, undertook an exhaustive effort to
calculate overtime hours based on AHPC's worksheet and payroll summaries. Based on

Roberts's testimony, the Court concludes that her methodology was logical, careful, and sensible.

As a result, the burden shifts to defendants to produce evidence in support of their own calculations, and defendants have not satisfied this burden. Although they did demonstrate reasons why the Secretary's calculation may not be perfect, they did not offer any organized evidence, either based on the provider aide records or otherwise, from which the Court could decide to discard or modify the Secretary's numbers. Defendants' failure to do so is all the more striking when considered in light of the multiple opportunities they received to come into compliance with their basic discovery obligations and the extensive guidance they received from the Court ahead of the trial. Ultimately, the Secretary's calculation is the best possible estimation based on the state of the evidence, and the Court finds that the Schedule A employees are entitled to a total of $64,222.90 in back wages as set out in PLEX 3.[24]

---

[24] Specifically, each PCA listed in Schedule A is entitled to back wages as follows: Angela Alanis is entitled to $50.00; Patience Ankrasi, to $1,299.29; Joseph Ansah, to $626.38; Roxana Arita, to $22.50; Kathy Averett, to $584.33; Bangura Animata, to $145.44; Elaine Bland, to $357.65; Nana Achiaa Karikari Boateng, to $1,870.00; Princess Brent, to $495.89; Queenempress Brent, to $30.00; Alice Brummett, to $500.94; Silvia Castillo, to $238.56; Catlyn Chaus, to $4,237.20; Karla Cortez, to $4,257.78; Afoa Crentsil, to $680.00; Gabriel Daraie, to $5,859.00; Malessia Dawson, to $9,160.94; Renee Dennis, to $353.75; Jacqueline Dunkley, to $4,839.40; Persable Edwards, to $800.00; Minabelle Foading, to $737.00; Guadalupe Gallardo, to $70.00; Cheryl Green, to $690.00; Florence Gyamfi, to $165.00; Robin Heiden, to $2,782.30; Traci Hicks, to $602.50; Isha Kargbo, to $87.50; Shiqesh Lewis, to $3,652.50; Felicita Lopez, to $2,670.06; Annie Martin, to $2,270.63; Lucilla Mayorga, to $185.00;Yendis Mejia, to $215.00; Elda Mendoza, to $65.00; Mahin Miramini, to $5,243.28; Sharon Nadeau, to $1,279.69; Dijohn Nolen, to $576.00; Ingrid Portillo, to $3,395.86; Iliana Quinteros, to $215.00; Claudia Romero, to $724.90; Alice Sanderson, to $1,131.94; Lydia Schaefer, to $432.69; Cory Shaulis, to $305.25; Andrea Van Pelt, to $141.25; and Amy Wadlow, to $175.50.

### 3. Liquidated Damages

The FLSA provides that any employer who violates § 207's overtime compensation provision "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an equal amount as liquidated damages." 29 U.S.C. § 216(b); see also id. § 216(c) (authorizing the Secretary to seek liquidated damages on affected employees' behalf). The liquidated damages provision "is not penal in its nature" but rather "constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945). Although an award of liquidated damages is the norm in cases involving FLSA violations, a district court may exercise discretion and decline to award all or some of the liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation" of the Act. 29 U.S.C. § 260. The employer bears the burden of convincing the court that liquidated damages should not be awarded and must point to "plain and substantial" evidence to satisfy that burden. Burnley v. Short, 730 F.2d 136, 140 (4th Cir. 1984).

Defendants have not carried that burden. To be sure, this is not a case in which the employer attempted to "remain 'blissfully ignorant' of the requirement of the FLSA and hope[d] to avoid an award of liquidated damages," Gilliam v. Montgomery Ward & Co., 912 F. Supp. 195, 198 (E.D. Va. 1996) (citation omitted), vacated on other grounds, No. 96-1210, 1997 WL 429454 (4th Cir. July 31, 1997). Defendants were generally aware of the FLSA and made some effort to abide by its requirements. For instance, Wright knew about the DOL regulation that entered into force in January 2015 clarifying that third-party employers may not claim the

companionship services exemption. In response, AHPC's governing board held a meeting to discuss the new regulation's implications and identify necessary changes to AHPC's compensation policies. See PLEX 10, at 1. The board assigned one of AHPC's managerial employees the responsibility of sending letters to all employees and patients explaining the change. Id. Wright also explored the DOL's website, did some research about the employee–independent contractor distinction, and weighed the six or seven factors relevant to that distinction that were identified on the site. Wright discussed that distinction, and how it applied to PCAs working for AHPC, with her accountant and during a hearing before the Virginia Workers' Compensation Commission.

Nonetheless, Wright had reason to doubt her conclusion that the PCAs at issue could properly be considered independent contractors. Many of the sources of information on which she relied were ambiguous at best. For example, the DOL factsheet defendants submitted at trial[25] identified the factors to be considered in classifying workers as employees or independent contractors, including "[t]he extent to which the services rendered are an integral part of the principal's business," "[t]he amount of the alleged contractor's investment in facilities and equipment," "[t]he degree of independent business organization and operation," and "[t]he amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor." DEX 5, at 1. These factors should have prompted Wright to second-guess her conclusion that any of the PCAs were independent contractors. The factsheet also contained notes of caution, including that "the place where work

---

[25] Although the factsheet is dated July 2008, Wright testified that she recognized the seven factors listed in the factsheet and believed that she had examined the same or a substantially similar document in 2015.

is performed" is "immaterial in determining whether there is an employment relationship" and that "[p]eople who perform work at their own home are often improperly considered as independent contractors." Id. at 1-2. Likewise, the Virginia Workers' Compensation Commission advised Wright that it was difficult to determine whether the PCAs were employees or independent contractors and that it would be safer to secure workers' compensation coverage for all PCAs. Yet she did not consult an attorney or the DOL about her conclusion. Although she spoke to an accountant about classifying PCAs as independent contractors, she testified that she merely reported her conclusion to the accountant and asked him to assist her with the tax consequences of that decision, not that she sought his advice with respect to how to best interpret the FLSA.[26]

In short, AHPC was neither willfully ignorant nor reasonably diligent with respect to finding out what the Act required, and for this reason the statutory default of liquidated damages is appropriate. Accordingly, the Court finds that the Schedule A employees are entitled to a total of $64,222.90 in liquidated damages, again as set out in PLEX 3.[27]

### 4. Wright's Liability

Finally, defendants argue that even if AHPC is liable for violating § 207, Wright does not qualify as an "employer" under the Act and should not be jointly and severally liable with her company. Defendants are incorrect: Wright clearly qualifies as an equally liable employer of the Schedule A aides.

---

[26] Defendants did not call the accountant as a witness, and there was no testimony at trial indicating whether the accountant in question, or even accountants in general, would have any special insight into the question whether specified workers were employees or independent contractors as a matter of federal employment law.

[27] For the aide-by-aide breakdown of each aide's entitlement, see note 24 above.

Under the FLSA, "employer" is defined to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). This definition is "expansive," Falk v. Brennan, 414 U.S. 190, 195 (1973), and the "overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Donovan v. Grim Hotel Co., 747 F.2d 966, 971-72 (5th Cir. 1984) (quoting Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)); see also, e.g., Ramirez v. Riverbay Corp., 35 F. Supp. 3d 513, 520-22 (S.D.N.Y. 2014) (explaining that an individual corporate officer may be liable as an employer where he "participat[es] in the development and implementation of payroll practices" and is "involve[d] in the implementation of . . . the allegedly unlawful timekeeping systems").

The touchstone for determining whether an individual is an "employer" for FLSA purposes is whether the individual possesses "substantial control [over] the terms and conditions of the work of . . . employees." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 83 (4th Cir. 2016) (quoting Falk, 414 U.S. at 195). That inquiry is in turn governed by the economic realities test, which itself depends on a host of factors including "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quoting Herman v. RSR Security Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)).

Wright was the sole owner and president of AHPC during the relevant time period and exercised substantial control over the policies, job responsibilities, and day-to-day functioning of the PCAs at issue in this lawsuit. Her name and signature appear all over the personnel records

as the PCAs' "supervisor," and testimony at trial established that she was intimately involved in decisions to hire, fire, and discipline aides. She approved their requests for time off, completed appraisals of their job performance, trained incoming PCAs on providing in-home personal care services, worked to ensure that the company's billing and timekeeping requirements complied with Medicare and Medicaid regulations, and often designed the plans of care PCAs had to follow. Wright also set each aide's rates of pay and resolved any disputes relating to payroll or scheduling that her human resources staff could not handle.

Wright argues that she is not an "employer" because other members of the AHPC staff were more involved in day-to-day scheduling, processing of provider aide records, and payroll. This argument is unpersuasive because it ignores the multifactor nature of the economic realities test and instead suggests that only low-level human resources personnel can constitute "employers" for FLSA purposes. This is a misstatement of the law that ignores the many factors indicating that Wright exercised effective control over various aspects of the conduct of the PCAs. Accordingly, she too is an "employer" for purposes of the FLSA, and she will be equally liable for the back wages and liquidated damages to be awarded in favor of the Secretary.

### B. Recordkeeping Requirements

The FLSA provides that every covered employer must "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him" and must "preserve [those] records for such periods of time . . . as necessary or appropriate for the enforcement of the provisions" of the Act. 29 U.S.C. § 211(c). Governing regulations "require that employers 'maintain and preserve payroll or other records' of '[h]ours worked each workday and total hours worked each workweek.'" U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC,

915 F.3d 277, 286-87 (4th Cir. 2019) (alteration in original) (quoting 29 C.F.R. § 516.2(a)(7)).

Although procedural in nature, these "stringent" recordkeeping requirements "are vital in

ensuring employer compliance" with the Act's substantive guarantees. Id. Failure to keep such

records subjects an employer to injunctive relief or, in the case of willful violations,[28] a statutory

fine. See 29 U.S.C. §§ 215(a)(5), 216(a), 217.

    The Secretary has demonstrated that defendants failed to maintain appropriate records.

Defendants could not offer the DOL investigator, the Secretary, or even the Court a single,

organized, comprehensive set of records showing how many hours each employee worked per

day and per week. Instead, what they offered was a mélange of imperfect alternatives: provider

aide records, which were organized not by aide but by patient, and which in any event seemed to

be incomplete;[29] worksheet summaries, which required a significant amount of time to convert to

easily accessible data,[30] and which in any event were missing for a significant portion of the

period under investigation;[31] and payroll summaries, which as discussed above were biweekly

---

[28] For a violation to be "willful," it must be shown "that the employer either knew or showed reckless disregard for" its noncompliance with the Act's requirements. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). The Secretary has not argued that defendants' violation of § 211 was willful, and the evidence presented at trial would not support such a finding.

[29] At trial, defendants insisted they had produced every provider aide record of which they were aware. But after the Secretary identified provider aide records he claimed were missing, defendants could not promptly locate them in counsel's physical or electronic files, suggesting that the records remained either incomplete or disorganized. Moreover, several PCAs testified that "respite care" hours were reported on separate, orange-colored sheets, none of which were provided to the DOL's investigator or presented to the Court.

[30] Roberts explained that although the worksheet summaries provide a breakdown of how many hours each aide worked for each patient, they often contained hours worked from previous pay periods; accordingly, to have an accurate view of an aide's total number of hours, it was necessary to cross-reference multiple summaries and manually add the hours together.

[31] Defendants argued that these worksheet summaries were missing because of the unauthorized, and possibly criminal, acts of a former human resources employee. This does not relieve them of responsibility. Although an employer cannot insure itself against all forms of destruction or loss

and thus did not contain the weekly breakdowns required by the Act and by the implementing regulations. Such incomplete, internally inconsistent, and difficult-to-access records do not satisfy the Act's stringent recordkeeping requirements.[32]

## C. Injunctive Relief

The FLSA authorizes the Secretary to seek injunctive relief prohibiting employers from ongoing or future violations of the Act. See 29 U.S.C. § 217. The injunctive relief provision "was designed and enacted as a necessary measure to assure the effective and uniform compliance with and adherence to a public policy . . . adopted in the National interest." Wirtz v. Jones, 340 F.2d 901, 903 (5th Cir. 1965). Because the injunctive relief envisioned by § 217 is "equitable in nature," "the trial court has broad discretion to fashion its decree according to the circumstances of each case." Clifton D. Mayhew, Inc. v. Wirtz, 413 F.2d 658, 663 (4th Cir. 1969). Where "[t]here is no reason to believe that defendants will not comply in the future," injunctive relief may be unnecessary and thus inappropriate. Wirtz v. Old Dominion Corp., 286 F. Supp. 378, 381 (E.D. Va. 1968); see also Marshall v. Van Matre, 634 F.2d 1115, 1117

---

of data, it can take steps to remedy those issues when they arise. Testimony at trial revealed that defendants continue to maintain all provider aide records from that time, and thus nothing prevented them from recreating the missing worksheet summaries based on those records.

[32] Defendants point out that in the "narrative" summarizing her investigation, Roberts indicated that "[n]o [recordkeeping] violations were identified." PLEX 27, at 5. The Court is not persuaded that this statement justifies a different conclusion. The narrative makes clear that Roberts's finding was preliminary in nature. See id. at 6 ("No apparent violations were identified . . . : however, Mrs. Wright was advised to review the publications provided to ensure a full understanding of what could constitute a violation under [§ 211] of the Act."). Moreover, when Roberts prepared that narrative in January 2018, she could not have known about the endless record-related difficulties that would plague defendants throughout this litigation. The simple truth is that nothing explains defendants' consistent inability to marshal the evidence they needed to make their own case on damages other than their contradictory, disorganized, and incomplete records.

(8th Cir. 1980) ("Guiding factors include the employer's previous noncompliance and the dependability of its promise of future compliance." (citation omitted)).

Injunctive relief is not warranted here. The record unambiguously indicates that once the DOL investigation was underway, AHPC reclassified all aides as employees and immediately began treating them as such. Indeed, it did so to its own detriment: Wright testified that over 10 of the Schedule A employees were so unhappy with the switch—and in particular with the resulting limitation that they could work no more than 40 hours per week unless they secured AHPC's advance consent—that they quit, with some taking patients with them. Nonetheless, AHPC remained resolved to comply with the FLSA's requirements, and both Wright and Mendez credibly testified that all PCAs would continue to receive time-and-a-half pay for all hours over 40 worked in a week. There is no reason to assume AHPC will violate § 207 again. Nor is there any reason to find that defendants will fail to adhere to Act's recordkeeping requirements in the future, particularly in light of the experience of this litigation. See PLEX 27, at 7 (Roberts' final report: "The employer appeared to be serious in her efforts to ensure future compliance.").

A permanent injunction is an "extraordinary equitable remedy" not to be awarded absent unusual circumstances. JTH Tax, Inc. v. Grabert, 8 F. Supp. 3d 731, 740 (E.D. Va. 2014). This is so even where a federal statute expressly grants an enforcement agency the right to seek the remedy. Because such extraordinary or unusual circumstances are not present here, no injunctive relief will be ordered.

### III. CONCLUSION

For the reasons stated above, judgment will be granted in favor of plaintiff, and

defendants will be held jointly and severally liable for back pay and liquidated damages in a total

amount of $128,445.80,[33] by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 15th day of April, 2019.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

---

[33] For each Schedule A aide's specific entitlement, see notes 24, 27 and accompanying text above. Under the FLSA, these amounts "shall be paid, on order of the Secretary . . . , directly to the employee or employees affected." 29 U.S.C. § 216(c).

At the conclusion of the trial, counsel for defendants asked the Court to delay issuance of a judgment so that the parties could attempt to reach agreement on a consent order establishing a payment plan. The Court denied that request, in part based on an understanding that the DOL regularly works with employers to balance the need to compensate employees for previous violations with the DOL's interest in preserving the economic viability of an ongoing enterprise. The Court strongly urges the Secretary to work with defendants toward that end. AHPC provides a valuable service to a very vulnerable population in the community and employs a significant number of individuals. The public interest is best served by devising a plan that will enable AHPC to remain in business as it works toward satisfying the judgment.